STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re: Appeal of<br> Joanne Bergeron | } } } } } | Docket No. 40-3-98 Vtec |

|  |  |  |
|---|---|---|
| Town of Colchester,<br> Plaintiff,<br><br> v.<br><br>Joanne Bergeron,<br> Defendant. | } } } } } } } } } } } | Docket No. 226-12-98 Vtec |

Decision and Order

In Docket No. 40–3-98 Vtec, Appellant Joanne Bergeron appealed from a decision of the Zoning Board of Adjustment (ZBA) of the Town of Colchester upholding a notice of violation letter issued by the Zoning Administrator. In the related enforcement case, Docket No. 226-12-98 Vtec, the Town of Colchester brought an enforcement action against Ms. Bergeron related to her year-round occupancy of property which the Town asserts may only be occupied on a seasonal basis. The Town of Colchester is represented by Richard C. Whittlesey, Esq.; Appellant is represented by Brian P. Hehir, Esq.

The Court denied the Town's motion for summary judgment in Docket No 40-3-98 Vtec, ruling that Appellant-Defendant could apply to the ZBA for approval of her property for year-round use, under the amended zoning regulations. Both matters were held in abeyance until after she had applied and had been denied approval, and her appeal from that denial was incorporated into the existing cases. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence, and the written memoranda and proposed findings, the Court finds and concludes as follows.

1

Appellant-Defendant Joan Bergeron owns and occupies the property at what was denominated 156 Lakeshore Drive (now renumbered as 355 Lakeshore Drive) in the Town of Colchester, in the R-2 zoning district. Both year-round and seasonal single-family dwellings are permitted uses in that district.

The lot has approximately 60 feet of frontage on Lakeshore Drive, and is approximately 100 feet in depth extending to the shore of Lake Champlain in the rear of the lot. It contains an insulated wood-frame single-family dwelling (residential building) on a five-foot-deep partial basement foundation. The dwelling contains two small bedrooms, a bathroom, a kitchen and a livingroom on the ground floor, and contains an unfinished upstairs area. It is equipped with water supply[1], sewage disposal, heat, hot water, and cooking facilities.

The Bergeron dwelling was originally constructed in 1949 by Appellant-Defendant's father, who purchased the lot in 1952, prior to the Town's adoption of either zoning regulations or health regulations covering on-site sewage disposal. It contained heating facilities when constructed, and was used from time to time in the winter as well as in the summer on a vacation or weekend basis, except that from approximately 1981 to 1984, Appellant-Defendant's sister occupied the dwelling year-round.

As originally constructed it had an on-site well and sewage disposal system. The municipal water main was installed to this area in approximately 1963. From 1984 through the spring of 1997, the fire district shut the water off each winter and turned it on again each spring at the request of the homeowner. The water supply to Appellant-Defendant's property has served the property continuously since June 1997.

The parties have not submitted the former zoning regulations in evidence in this appeal. Health Regulations governing individual subsurface sewage disposal systems were adopted in Colchester in 1971 and amended in 1972. Specifically, the Town Health Regulations provide that subsurface disposal systems shall comply "with these regulations and any applicable regulations of the Vermont Department of Health and of the Agency of Environmental Conservation." The Town Health Regulations also provide if any other

_____

[1] It is connected to a municipal water supply and retains an on-site well of unknown water quality, dating from the time the dwelling was originally constructed.

applicable regulation, by-law, ordinance or statute differs from the requirements of the Town Health Regulations, "the more strict shall apply." It is the practice of the Town official responsible for administering the Town Health Regulations to use the isolation distances of Appendix 1-7D and the other requirements of Subchapter 7 of the state's Environmental Protection Rules ("EPRs" - adopted effective August 8, 1996) as a general guide to approval of on-site septic systems, but neither the Town's Health Regulations nor the 1997 Zoning Regulations have adopted the current state Environmental Protection Rules by reference. The Town Health Regulations do not differentiate between seasonal and year-round dwellings with regard to sewage system requirements.

The current septic system was installed in approximately 1975 pursuant to sewage system permit No. 38-6 issued by the Town on August 20, 1975 to Appellant's father, Martin Bowen. The sewage system permit allowed the installation of a "new septic tank and 1 (one) 1200 gal dry well or 2 (two) 600 gal. dry wells." Except for Mr. Bowen's signature and address, all entries on the permit application form appear in the same pen as the signature of the Town's representative who issued the permit. Two entries were filled in under "type of facility:" the space for "single" was checked, and the space next to "other" was filled in as "camp." The number of bedrooms was filled in as "2," the required area of leach field as "250" square feet, and the required septic tank size as "750" gallons. The percolation rate was filled in as "less 5 min/in," the soil type was filled in as "sand," and the depth of ground water was filled in as "20' +."

A 1000 gallon septic tank was installed on the property, connected to two 600 gallon drywells, installed with their long sides adjacent. Each drywell measured 8' 6" (8.5') long by 4' 10" (4.83') wide by 2' 9" (2.75 feet) deep. Because they are installed adjacent to one another, the adjacent inner long side of each cannot be counted in determining the available surface area of the drywell installation. In effect, the drywells were installed as the single 1200 gallon installation allowed by the permit, rather than as two 600 gallon ones. As installed, their combined bottom surface area is 82.11 square feet, and their combined sidewall surface area is 99.88 square feet. Thus, the combined seepage area of the drywell installation is 181.99 square feet. The septic system was inspected by an engineer in 1999 in connection with the present application. It shows no evidence of failure or malfunction. The septic tank for the system is larger in capacity than the minimum

3

required by the 1975 permit. The drywells conform to the requirements of the 1975 permit in volume, but do not provide the 250 square feet of seepage area required for two bedrooms. If the dwelling were converted to a one-bedroom dwelling, the Town Health Regulations would require 125 feet of seepage area, which is met by the current installation.

The drywells are located approximately 86 feet from Lake Champlain and at least 10 feet from the municipal water main. Section 6.09 of the Town's Health Regulations contains the only setback requirements in the Town regulations, and allows the Health Officer to approve shorter setback distances than otherwise required.

In 1984, Appellant-Defendant inherited the property from her father. With her husband, she also owned a residence on Bean Road in Colchester since approximately 1964. From 1984 through the summer of 1997, Appellant-Defendant occupied the Lakeshore Drive property during the summer months and resided in the Bean Road home during the remainder of the year. Over the years, Appellant-Defendant and her husband, who died in February 1996, stayed overnight in the Lakeshore Drive dwelling from time to time in the winters, as well as using the property in the summers. During this time, they upgraded the windows and insulation in the dwelling, intending eventually to retire there and live there full-time.

In August of 1994, Appellant-Defendant and her husband applied for a permit for year-round occupancy under the former zoning regulations. The application was not submitted in evidence. The 1994 application was denied by the Zoning Administrator, whose denial letter stated that the existing building failed to meet three required setbacks: from the building to the road, from the building to the lake, and from the septic system to the lake. The denial letter stated further that §1801.9 of the former regulations provided that a seasonal dwelling unit shall not be "altered, improved or reconstructed" for use as a year-round dwelling unit unless such use is in conformance with "all current requirements of applicable Regulations." No party appealed from the denial under the former regulations. Conversion of seasonal use to year-around use of a structure was not specifically defined as an "alteration or enlargement" of a non-conforming use until the 1997 regulation amendments.

In 1996, floods washed out the basement of the dwelling, and Appellant-Defendant obtained a permit from the Town to replace the foundation. On the application for that

4

permit, Appellant-Defendant had checked the space marked "single." The space for "seasonal" was marked in another handwriting with an asterisk and the notation "see attached letter dated 11-17-94," referring to the previous denial. Appellant-Defendant moved in after the foundation was repaired in the spring of 1997, and rented out the Bean Road home to tenants beginning in June of 1997. Thus, she began her year-round occupancy as of June 1, 1997, although from the Town's perspective it was not treated as a violation until the end of the 1997 "summer" season on October 31, 1997.

The Zoning Regulations were amended generally, effective September 9, 1997. Section 1800 provides that "no building or structure shall be erected, constructed or altered and maintained" and that "no new use or change shall be made or maintained of any building, structure or land" except in conformance with the regulations. Section 1801 of the 1997 Regulations addresses "non-conforming uses," which it defines as "those uses which do not conform with the use regulations[2] set forth in this ordinance." (Emphasis added.)

Section 1801 further provides that:

Any structure containing a nonconforming use, or any structure which is nonconforming under [another section requiring one building per lot] shall not be relocated, moved, enlarged, altered, extended, reconstructed or restored, except in strict conformance with these regulations. Conversion of seasonal use to year-around use of a structure shall be considered an alteration or enlargement.

Section 1801.1 addresses specific requirements for Class A (residential) nonconformities.

---

[2] We note that this definition contains an important limitation not addressed by the parties in their arguments. The definition appears on its face to apply only to 'structures containing nonconforming uses', rather than to structures which are dimensionally nonconforming (this latter category is addressed instead in §1802). Both year-round dwellings and seasonal dwellings are conforming uses in this district. Under the reasoning of In re Appeal of Miserocchi, Docket No. 99-166 (Vt. Supreme Ct., January 28, 2000), it is possible that the ordinance must more specifically regulate the conversion of one conforming use to another than is provided in §1801.1.

Subsection (e) allows Class A nonconforming uses to be altered with conditional use approval from the ZBA. Subsection (f) allows Class A nonconforming uses to be enlarged with conditional use approval from the ZBA, if the enlargements do not increase dimensional requirements such as setbacks. Subsection (g) provides in full that:

> Before any approval is granted hereunder the Town Official administering Chapter 8- Health Regulations of Colchester's Code of Ordinances, must approve the sewage disposal system serving the use in accordance with said Health Regulations. Sewage requirements shall not be waived by the Planning Commission or Zoning Board of Adjustment. The requirements for proper handling of on-site sewage disposal shall supersede any nonconforming rights under this section.

As of June 1, 1997, and continuing after the end of the summer season of 1997, Appellant-Defendant continued to live at the property on a year-round basis. In or around October of 1997, she instructed the fire district not to disconnect the water.

The Zoning Administrator issued a Notice of Violation to Appellant-Defendant on November 14, 1997, directing her to cure the violation by ceasing to "us[e] the dwelling except during the period of April 1 to October 30."

Appellant-Defendant applied in May 1999 for conditional use approval of the year-round use, including the septic system installed in 1975. That approval was denied, and Appellant's appeal of that denial was incorporated in the above-captioned cases by agreement of the parties.

Year-round rather than seasonal use affects the design of a new septic system in several ways. The daily design flow is increase under year-round use; under the current state Environmental Protection Rules, a septic system for a seasonal camp is designed for a flow of 100 gallons per day per bedroom, while a septic system for a year-round dwelling is designed for a flow of 150 gallons per day per bedroom. The groundwater level tends to be lower in the summer, creating greater distance between the system and the groundwater during the summer season. During the time the system is not being used in the winter, the septic field 'rests' and recovers capacity, plus the 'mound' of groundwater induced by the use of the system has a chance to subside.

Discussion

The Town has sought protect the vulnerable areas near the shore of Lake Champlain by revising its zoning regulations to set lakeshore setbacks for buildings and septic systems for new construction, by requiring new on-site septic systems to meet rigorous standards, and by requiring conditional use permits for new year-round construction in some zones as opposed to the former practice of allowing residential use as a permitted use not requiring prior review by the ZBA.

The Town has also sought to regulate previously-existing lakeshore development, in particular by regulating the conversion of seasonal camps to year-round use. Such regulation of existing development requires a balance to be established between the landowner's vested rights in the existing use of the property, and the town's interest in protecting its resources and phasing out non-conforming uses. Thus, the Vermont Supreme Court emphasized in Appeal of Weeks, 167 Vt. 551, 555-56 (1998) that in construing land use regulations any ambiguity must be resolved in favor of the property owner.

Appellant-Defendant first argues that the dwelling qualified as a year-round dwelling unit, not a seasonal dwelling unit, and that therefore no permit was required when Defendant-Appellant began to live in it year-round.

The 1997 Zoning Regulations contain a summer and a winter[3] definition of "seasonal dwelling unit." The Town claims that until October of 1997, the property was a summer seasonal dwelling unit, and that therefore the 1997 Zoning Regulations apply. The Town required Defendant-Appellant to obtain a permit to live in the dwelling year-round, even though she did not propose to making any physical changes to the dwelling or its septic system.

The definition of a "year-around dwelling unit" in the 1997 Zoning Regulations is entirely based on the calendar and not on the presence of any amenities or utilities: "A dwelling unit continuously occupied from January 1st through December 31st." By contrast, the definition of a "seasonal dwelling unit (summer)" in the 1997 Zoning Regulations is: "A

---

[3] The summer season is defined as "from April 1st to October 30th", while the winter season is defined as "from November 1st through April 1st," thus oddly excluding October 31 from either season, and including April 1 in both. This ambiguity in the definition, however, is not material to this case.

dwelling unit not continuously occupied <u>and that lacks</u>[4] one or more of the basic amenities or utilities required for year-around occupancy. The summer season shall be from April 1st to October 30th." (Emphasis added.)

The 1997 Zoning Regulations do not define a list of the basic amenities or utilities required for year-around occupancy. They do define "dwelling unit" as having "cooking, sleeping and sanitary facilities" for the use of the household within that dwelling unit. Considering the definition of the dates of the summer season and the definition of dwelling unit, we must conclude that the "basic amenities or utilities required for year-around occupancy" are cooking and sleeping facilities, water supply and sewage disposal facilities, and at least a heating system, if not also some form of insulation.

The plain text of the "summer" definition requires that both prongs of the definition be satisfied. That is, to qualify as a summer seasonal dwelling, the dwelling must not be continuously occupied <u>and</u> must lack one or more of the basic amenities or utilities required for year-round occupancy. In the present case, the dwelling does not lack any of the basic amenities or utilities required for year-round occupancy, including heat, hot water and insulation. In particular, it is served by a municipal water system and is served by an existing on-site sewage disposal system that was installed under a permit from the Town and has not failed.

Because Defendant-Appellant's building does not qualify as a summer seasonal dwelling, and because her year-round occupancy began in June 1997 before the adoption of the definition of year-around dwelling unit, no permit was required for Appellant-Defendant to begin year-round occupancy.

If a conditional use permit were required for year-round occupancy under §1801.1, the parties have agreed that the only conditional use criterion remaining at issue is whether

---

[4] By comparison, the "winter" definition is: "A dwelling unit not continuously occupied <u>and [that] may lack</u> one or more of the basic amenities or utilities required for year-around occupancy." (Emphasis added.) The Town does not argue that Defendant-Appellant's dwelling should be considered under this definition.

the existing septic system qualifies for approval under §1801.1(g) "in accordance with [the Town] Health Regulations." The Town's position is that this language means that the existing septic system must meet all the town and state standards now required for new construction. However, neither §1801.1(g) nor the Town Health Regulations imposes such a requirement.

There is no question that Defendant-Appellant's existing septic system does not meet the standards under the Town's regulations for new construction, as to its setbacks, as to the requirements for groundwater testing and as to the design of a drywell system. However, the septic system received a permit under regulations which did not (and still do not) distinguish between seasonal and year-round uses. The system was constructed in accordance with its permit, and has not failed. The Town Health Regulations themselves do not require review or reconstruction of existing septic systems which have not failed. Consequently, §1801.1(g)'s requirement that the system be approved "in accordance with the Health Regulations" does not create by implication any requirement for approval of the system as if it were new construction.

Further, references in the Town Health Regulations to 'applicable' state regulations must refer to whatever state regulations were in effect as of the adoption date of the Town's regulations. While existing bylaws, state regulations or statutes may be incorporated by reference into a municipal ordinance, future changes in the state regulations cannot be incorporated into the Town's regulations by reference in this manner, as they are too indefinite at the time of the incorporation. See, generally, McLaughry v. Town of Norwich, 140 Vt. 49, 53 (1981). Moreover, the Town Health Regulations only require compliance with "applicable" state regulations. Nothing in the current state EPRs makes them applicable to existing systems which have not failed.

Because ambiguities are construed to favor the landowner, the language of §1801.1(g) cannot be construed to require an existing septic system to meet the standards for construction of a new system. If the Town wishes to require existing septic systems serving seasonal dwellings to meet the standards for new construction before conversion to year-round use will be approved, it must explicitly so require in its regulations. Similarly, if the Town wishes to require seasonal dwellings with pre-existing non-complying systems to connect to a municipal sewer as soon as one is built to serve the area, it must explicitly

so require in its regulations.

Accordingly, it is hereby ORDERED and ADJUDGED that in Docket No. 40-3-98 Vtec the Notice of Violation is reversed, and judgment is entered in Docket No.226-12-98 Vtec in favor of Defendant.

Done at Barre, Vermont, this 19th day of June, 2000.

_____
Merideth Wright
Environmental Judge